UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAMES C. CARNEY,** | **2:20-CV-12599-TGB-RSW** |
| Plaintiff, | |
| vs. | **ORDER RESOLVING CROSS MOTIONS FOR JUDGMENT ON THE RECORD (ECF NOS. 11, 12)** |
| **UNUM LIFE INSURANCE COMPANY OF AMERICA,** | |
| Defendant. | |

Plaintiff Dr. James Carney brings this suit seeking long-term disability benefits under an insurance policy issued to Carney's employer, Michigan Healthcare Professionals, P.C. That policy was issued by Unum Life Insurance Company of America ("Unum"), and is governed by the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §§ 1001 et seq. In brief, Carney argues that UNUM improperly concluded that he was not disabled as the result of a spinal injury, and was therefore not entitled to long-term disability benefits. For the reasons set forth below, Plaintiff's Cross-Motion for Judgment on the Record is **GRANTED**. Accordingly, Defendant's Motion for Summary Judgment is **DENIED**, and this case is **DISMISSED** with prejudice.

# I.   Background

## a. Carney's background and job duties

Plaintiff Dr. James Carney is a 66-year-old physician. He graduated from medical school in 1982 and, in 2000, began working full-time for Michigan Healthcare Professionals, P.C. as an internal medicine physician. The relevant long-term disability policy here was issued by Unum to Michigan Healthcare Professionals. That policy provides that a person is regarded as disabled if they are "**limited** from performing the **material and substantial duties** of [their] **regular occupation** due to [their] **sickness** or **injury**" and they "have a 20% or more loss in [their] **indexed monthly earnings** due to the same sickness or injury." Administrative Record, ECF No. 8, PageID.113. [1] (emphasis in original). A person must also "be under the regular care of a physician in order to be considered disabled." *Id*. Finally, a person must be "continuously disabled" through a 90-day "elimination period" for disability benefits to apply. *Id* at PageID.113-14.

Michigan Healthcare Professionals, P.C., provided the following description of Plaintiff's job:

> Dr. Carney is a physician that sees patients in an office setting. As a physician he evaluates the patients [sic] medical condition; from treating chronic illnesses to advising about preventative healthcare. He often does this by performing

---

[1] All citations to the sealed Administrative Record will be made by PageID number.

physical exams, taking medical histories, performing and interpreting diagnostics tests, and recommending a plan of treatment. Dr. Carney's job includes constant [standing], bending, writing or typing, conducting patient manipulation and lifting. He must be attentive and not physically or mentally impaired when conducting a patient evaluation and preparing medical notes.

Record at PageID.377. Carney also noted, in an email to Unum, that he is obligated to "respond promptly to patients 24 hours per day, seven days per week, whether in person or by cell phone and pager or email." *Id.* at PageID.498.

### b. Carney's medical condition and treatment

According to Carney, sometime in mid-2017, he began experiencing neck pain. Record at PageID.170. Carney did not identify a specific injury or event that triggered the pain. *Id.* By 2019, the pain had worsened significantly. *Id.* Between July and September of 2019, Carney had several visits with Dr. Marc Wittenberg, a pain management specialist. *Id.* at PageID.249. During those visits, Dr. Wittenberg performed several test nerve blocks in Carney's neck.[2] *Id.* at PageID.249, 689, 693. Carney reported "excellent" pain relief after one of these procedures. *Id.* at PageID.751. However, this pain relief was temporary. *Id.* at PageID.689.

---

[2] A nerve block is a medical procedure in which a local anesthetic and other medicines injected into or near a spinal joint. They can be used to treat pain or diagnose its cause. *Nerve Blocks*, Brigham and Women's Hosp. Health Library (last updated Jul. 1, 2021), https://healthlibrary.brighamandwomens.org/134,128 [https://perma.cc/ACK7-Q5C8].

Subsequently, on September 27, Carney had an additional procedure: a cervical rhizotomy of the facet joints identified in the prior procedure as the probable source of his neck pain.[3] *Id.* at PageID.688-89. However, this procedure "did not provide significant relief." *Id.* at PageID.159.

On November 9, 2019, Carney had a spinal MRI. *Id.* at PageID.754-55. About a week later, Carney was seen by Dr. Anthony Emmer, a neurologist, who noted that Carney's symptoms, which had previously been intermittent, had "become constant and daily," causing frequent pain and difficulty sleeping, that Carney was "intolerant of anti-inflammatories" and had tried a number of other pain medications, which were not helpful, and that Carney's symptoms were "getting to the point where it is affecting [Carney's] work." *Id.* at PageID.159. Dr. Emmer reported that the November 9 MRI "demonstrated multilevel degenerative changes" including herniated discs. *Id.* Dr. Emmer prescribed a nerve conduction study, physical therapy two to three days a week, and a trial of methocarbamol, in addition to the Tylenol #4 that Carney had been taking since some time in 2018.[4] *Id.* at PageID.161. Finally, Dr. Emmer expressed

---

[3] A rhizotomy is a surgical procedure in which parts of the nerves determined to be causing a patient's pain are destroyed. *Nerve Blocks*, Brigham and Women's Hosp. Health Library (last updated Jul. 1, 2021), https://healthlibrary.brighamandwomens.org/134,128 [https://perma.cc/ACK7-Q5C8].

[4] Methocarbamol is a muscle relaxant and pain reliever. *Methocarbamol*, National Library of Medicine (2017), https://medlineplus.gov/dru-

that "concern arises that this patient has gotten to the point where he is unable to perform his work duties." *Id.*

On November 25, Carney was evaluated by John Czarnecki, a physical therapist. The evaluation indicated "severe activity limitation" connected to his neck injury, a "severe problem" with sleep disruption, "severe pain" in the preceding 24 hours, and a "severe impairment" as a result of headaches. *Id.* at PageID.538. On December 10, 2019, Carney underwent the nerve conduction study Dr. Emmer had ordered: a "needle electrode exam"[5] performed by Dr. Nathan Gross. While the results of this exam were mostly normal, Dr. Gross concurred that Carney suffered "a mild right C6 or C7 cervical radiculopathy."[6] *Id.* at PageID.162-63.

ginfo/meds/a682579.html [https://perma.cc/5Q48-GRP8]. Side effects include drowsiness, dizziness, and upset stomach. *Id.* Tylenol #4, also referred to in this Order as "Tylenol with codeine" is a pain reliever that combines acetaminophen and codeine, an opiate. *Acetaminophen and Codeine*, National Library of Medicine (2020), https://medlineplus.gov/druginfo/meds/a601005.html [https://perma.cc/RAR2-FR2K]. Side effects include drowsiness, dizziness, headache, constipation, nausea, and potential withdrawal symptoms. *Id.* The medication also "may be habit forming, especially with prolonged use." *Id.*

[5] A needle electrode exam is a study that assesses the health of muscles and nerves, in which a needle electrode is "inserted directly into a muscle" and records the electrical activity therein. *Electromyography (EMG)*, Mayo Clinic (last visited Mar. 28, 2022), https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 [https://perma.cc/GC4Y-PWV4].

[6] A "cervical radiculopathy," commonly called a pinched nerve, "occurs when a nerve in the neck is compressed or irritated where it branches away from the spinal cord," and may "cause pain that radiates into the

A week later, on December 16, Carney was again seen by Dr. Emmer. The visit notes indicate that Carney could not tolerate the methocarbamol that had been prescribed, and was now reporting occasional tinnitus and vertigo. *Id.* at PageID.263. Physical therapy was reported as providing "only temporary improvement in symptoms." *Id.* Dr. Emmer referred Carney for an epidural steroid injection, which was performed on December 20, 2019 by Dr. Marc Wittenberg. *Id.* at PageID.264, 743-44.

In subsequent letters and during doctors' visits, Carney explained that, as his condition accelerated, he was no longer able to engage in hobbies and social activities, and that his ailment had taken a toll on his "physical, cognitive, professional and spiritual well-being." *Id.* PageID.602. He indicated that he was unable to take pain medications during the workday out of a concern that these medications, such as Tylenol with codeine, could affect his "memory and concentration," and would interfere with his ability to exercise sound medical judgment and would potentially endanger patient safety. *Id.* at PageID.603. Carney also described how the pain he experienced caused sleeplessness, which

---

shoulder and/or arm, as well as muscle weakness and numbness." OrthoInfo, Am. Academy of Orthopaedic Surgeons,
(last updated Aug. 2020), https://orthoinfo.aaos.org/en/diseases--conditions/cervical-radiculopathy-pinched-nerve/   [https://perma.cc/WD3P-B2FH].

in turn resulted in daytime fatigue and other cognitive difficulties that impaired his ability to practice medicine. *Id.*

With those concerns in mind, December 16, 2019 Carney submitted a claim to Unum for disability benefits, indicating that he was unable to work as a physician as of December 2, 2019, as a result of cervical radiculopathy. *Id.* at PageID.67-73. Dr. Seth Mindell, Carney's primary care physician, completed an "attending physician statement" form, in which he indicated that Carney suffered from cervical radiculopathy and cervicalgia,[7] and that Dr. Mindell had advised Carney to stop working. *Id.* at PageID.238-40. Dr. Mindell also wrote, on another such form submitted January 4, 2020, that Carney was "unable to fulfill [his] duties as [a] physician due to chronic pain [and] significant cervical degenerative disc disease." *Id.* at PageID.232-33.

After submitting his disability claim, Carney continued to see his various treating doctors. On January 27, 2020, Carney was seen by Dr. Emmer, who reported that Carney's symptoms were unchanged. *Id.* at PageID.722. Physical therapy provided only "minimal change." *Id.* Dr. Emmer also noted that a "recent epidural . . . only provided transient improvement in symptoms, they have returned to baseline." *Id.* Carney's

---

[7] "Cervicalgia" is "a term used to describe pain or significant discomfort in [the] neck, especially at the back and/or sides." *Cervicalgia Symptoms and Treatment*, Verywell Health (last updated Feb. 20, 2022), https://www.verywellhealth.com/cervicalgia-definition-296573 [https://perma.cc/6U3J-MQ6Y].

vertigo was resolved, but he continued to suffer tinnitus. *Id.* Carney also reported additional sleep disruption due to "paresthesias of the distal upper extremities and hands,"[8] and a "cold-like sensation of the hands." *Id.* On February 6, 2020, Dr. Emmer completed a "restrictions and limitations" form, indicating the following physical limitations on Carney's work: "no prolonged sitting, neck flexion, use of arms at above parallel to ground. No pushing, pulling, twisting, or bending. Cannot keep neck in flexed or extended position. No repetitive use of hands/upper extremities." *Id.* at PageID.358.

### c. Unum denies Carney's benefits application

#### i. Review by Dr. Jennifer Ju

On February 26, 2020, Dr. Jennifer Ju, a board-certified family medicine practitioner reviewed Carney's file for Unum, and provided a preliminary report to Dr. Emmer and Dr. Mindell, in which Dr. Ju concluded that "the medical evidence does not appear to support the restrictions and limitations precluding [Carney] from full-time light occupational demands[.]" Record at PageID.405-6. Notably, Dr. Ju did not appear to mention or address any of Carney's claimed cognitive limitations, nor his complaints that his pain specifically affected his ability to exercise

---

[8] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet. . . . Chronic paresthesia of often a symptom of . . . traumatic nerve damage." *Paresthesia Information Page*, National Institute of Neurological Disorders and Stroke (last updated Mar. 27, 2019), https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page [https://perma.cc/4YRD-RELU].

medical judgment due to fatigue, the side effects of pain medication, and the pain itself, instead focusing purely on the physical requirements of Carney's work.

Dr. Mindell responded the next day, writing on the provided form that "[Carney] has quite significant [degenerative disc disease] and is in chronic pain daily. This interferes with his ability to function . . . as an internist." *Id.* at PageID.425. On March 2, Dr. Emmer responded on the provided form: "[Carney] has debilitating burning/dysthesias + pain in B/L upper extremities along w/ pain + spasm in the neck — severe + disabling. He has headaches that also occur which are severe + disabling. These are disabling symptoms due to his <u>non-surgical </u>c-spine disease. He's non surgical because it won't work or get worse. He's failed pain management/meds." *Id.* at PageID.455. (emphasis in original). Dr. Emmer also supplemented his response with a letter further detailing Carney's symptoms and explaining that Carney had failed multiple medications, other pain management treatments, and physical therapy, and that Carney was not a surgical candidate—"not because his symptoms are 'not bad enough', but that a surgery will not help him and if anything, make him worse." *Id.* at PageID.451. Dr. Emmer also opined that he "completely and entirely disagree[d]" with Dr. Ju's opinion, and explained that Carney's "discogenic and degenerative changes" were "absolutely the culprit for his symptoms." *Id.* Dr. Emmer further indicated that

Carney's condition was "degenerative," and that "disabling pain will continue to progress." *Id.*

### ii.  Review by Dr. Maribelle Kim

Because of the disagreement between Dr. Ju and Carney's treating doctors, in early March 2020, Dr, Maribelle Kim, a board-certified internal medicine practitioner and Unum "On-site Physician," conducted a second review of Carney's file. *Id.* at PageID.465-67. Dr. Kim concluded that the proposed restrictions and limitations were not supported by Carney's medical file. Dr. Kim noted that Carney's November 9, 2019 MRI revealed "no significant stenosis," and the December 10, 2019 nerve study showed "only mild right C-6 or C7 radiculopathy with mild chronic denervation." *Id.* at PageID.466. Dr. Kim also noted that Dr. Emmer described the spine MRI as demonstrating "no overt cause for [Carney's] symptoms." *Id.* Dr. Kim also pointed out that a neurosurgeon determined that Carney "did not require surgical intervention," and that Carney's medication regimen was "relatively stab[le]." *Id.* Dr. Kim concluded that Carney's file did not support the conclusion that Carney was precluded from performing the light physical duties of Carney's job as a physician. However, Dr. Kim, like Dr. Ju, failed to discuss any cognitive limitations on Carney's ability to work.

### iii.  Review by Dr. Stephen Broomes

On March 11, 2020, Dr. Stephen Broomes, Unum's Designated Medical Officer, reviewed Dr. Kim's report. Dr. Broomes characterized

the disagreement in this case as a question of "the claimant's ability to perform **light** occupational demands on a full-time basis." *Id.* at PageID.469 (emphasis in original). Dr. Broomes detailed the physical requirements of Carney's job but, just like Doctors Ju and Kim, did not discuss any cognitive limitations. Dr. Broomes concurred with Dr. Kim's review of the file, concluding that Carney "appears to have returned to baseline capacity," that Carney's vertigo had resolved, that his tinnitus was improved by hearing aids, and that he "reported no medication side effects from Methocarbamol[.]" *Id.* at PageID.470. Dr. Broomes also noted that Carney was not a candidate for surgery, and reviewed the findings of the MRI and nerve survey procedures. *Id.* On this basis, Dr. Broomes concluded that Carney "should be able to work full-time within the light range of functional demands" described elsewhere in Broomes' report. *Id.*

### iv.  Unum issues its denial of Carney's claim

On March 20, 2020, Unum denied Carney's disability benefits claim. The denial detailed the physical requirements of Carney's job as a physician, and explained the findings of Dr. Kim and Dr. Broomes' reviews of Carney's file. *Id.* at PageID.481-83.

### v.  March consultation with Dr. Jacobson

Shortly after Unum's denial of benefits, Carney consulted with Dr. Mark Jacobson, a spine surgeon. Dr. Jacobson noted that Carney's pain

was related to degenerative disc disease and facet arthropathy,[9] and that "[t]he pain and medications require to treat it [were] impairing [Carney's] ability to practice as a physician." *Id.* at PageID.505. Jacobson did not recommend surgery, concluding that it would not be beneficial, and could even exacerbate Carney's symptoms. *Id.* Finally, Jacobson also wrote: "I agree that [Carney's] symptoms and medications required to manage these symptoms are impairing his ability to practice medicine." *Id.*

### d. Carney's appeal of Unum's denial

#### i. Carney's initial appeal

On March 31, 2020, Carney appealed Unum's denial, submitting a detailed letter explaining his disagreement with Unum's findings. *See* Record at PageID.496-503. In his appeal letter, Carney argued that the reviewing doctors had made several factual errors in interpreting the medical records, overlooked certain facts favorable to the conclusions drawn by Carney and his treating physicians and, most importantly, overlooked the cognitive aspects of Carney's disability claim. Carney also noted that he had shared with Unum's reviewer specific examples to support his concerns that his condition and the pain medication required to treat it could impact patient management. *Id.* at PageID.498.

---

[9] Facet arthropathy is a degenerative syndrome affecting the "lumbar zygapophysial joint," also referred to as the "facet joint." *Lumbar Facet Arthropathy*, National Center for Biotechnology Information (last updated Oct. 16, 2021), https://www.ncbi.nlm.nih.gov/books/NBK538228/ [https://perma.cc/85ZG-ME5Z].

### ii.  Review by Dr. Norris

On April 7, 2020, Dr. Scott Norris, board certified in Family, Occupational, and Aerospace Medicine and another Unum "On-Site Physician," conducted a review of Carney's file. Record at PageID.589-93. Reviewing both the medical records in the file and Carney's appeal letter, Dr. Norris concluded that the "minimal findings on physical examinations and the moderate stable degenerative changes" found in the MRI were not consistent "with the severe level of impairment reported" by Carney. *Id.* at PageID.589. Dr. Norris also concluded that Carney's "level of treatment" was not consistent with the "severe level of impairment" Carney reported. *Id.* at PageID.589-90, that the "file records [did] not support" limitations related to "adverse medication effects," *Id.* at PageID.592, nor "concerns about excessive daytime sleepiness or fatigue," and did "not describe a significant escalation in the intensity of treatment for pain." *Id.* Dr. Norris requested additional information from Carney's treating doctors. *Id.*

### iii.  Carney's response to Dr. Norris' review

On April 8, 2020, Unum sent Dr. Norris' review to Carney, offering him the opportunity to respond. *Id.* at PageID.595-96. On April 13, 2020, Carney submitted a written response. Carney disagreed with Norris' conclusion that his condition was not escalating significantly, and disputed that the treatment plan was "stable and modest." *Id.* at PageID.603-604. Carney detailed a number of medication side effects. *Id.* Carney also

13

pointed out that more aggressive treatments, such as further injections, were impossible due to the COVID-19 pandemic. *Id.* at PageID.605. Carney emphasized the cognitive limitations caused by his pain and the medications required to treat it. *Id.*

### iv. Subsequent letters of support from Carney's treating doctors

In further support of his disability claim, a number of practitioners who had treated Carney submitted letters detailing the progression of his condition. On April 19, 2020, Dr. Mindell submitted a letter of support, explaining that his treatment plan for Carney had been deliberately conservative—he had initially prescribed limited pain medication to avoid interfering with Carney's work as a doctor. *Id.* at PageID.627. Mindell also pointed out that oral pain medication, spinal epidurals, and facet injections had been unsuccessful in treating Carney's pain. *Id.* Dr. Mindell also pointed out that Carney's "use of tylenol with codeine is increasing," and that Carney had "increasing pain basically 24 hrs per day." *Id.*

On April 20, 2020, Carney had another visit with Dr. Emmer, in which Dr. Emmer noted that Carney's symptoms were "persistent" and "overall unchanged." *Id.* at PageID.719. He detailed a number of medications that Carney had been unable to tolerate for various reasons. Dr. Emmer repeated that "because of [Carney's] persistent pain, he is disabled permanently as a physician." *Id.* at PageID.720.

14

On May 8, Carney had a virtual appointment with Dr. Mindell. The notes reflect that Carney was taking "up to 3 [tylenol with codeine] per day" which were not working to control his pain, and was still experiencing headaches and arm numbness. *Id*. at PageID.792. The notes also reflect that Carney was "unable to work," was experiencing "chronic pain making it unable to concentrate," and that Carney was unable to tolerate other medicines. *Id*.

On May 11, Dr. Michael Laffer, who had been treating Carney's sleep apnea and other sleep issues, submitted a letter supporting Carney's benefits request. Dr. Laffer wrote that Carney's chronic pain "has caused his sleep to deteriorate as far as quality and quantity," which was causing fatigue and difficulty concentrating. *Id*. at PageID.800. Dr. Laffer opined that medication could help treat Carney's sleep issues, but "would impact [Carney's] ability to function as a physician." *Id*.

### v. Dr. Norris' addendums

On May 20, 2020, Dr. Norris drafted addendums to his original analysis addressing these letters and Carney's response, in which Dr. Norris reaffirmed his conclusion that Carney was able to work as a physician. Specifically as to cognitive impairment, Dr. Norris concluded that Carney had not "reported specific impairing side effects related to pain medications (Tylenol [with codeine] and lorazepam)." *Id*. at PageID.820. Based on "[Carney's] long duration of regular opioid use while still working, the evening dosing schedule of Tylenol [with codeine], and the lack

15

of cognitive . . . deficits on examinations," the evidence did "not support ongoing impairment" related to pain medications. *Id.* at PageID.820-21. As to sleep disturbance, Dr. Norris noted that Carney had not "followed up to consider a trial" of proposed trial of a cock-up splint to alleviate nighttime pain, nor was there any evidence that Carney "required recent clinical reevaluation by Sleep Med." *Id.* at PageID.821.

Overall, Dr. Norris concluded that "the available records do not support significant physical or cognitive impairment . . . that would have precluded light demand occupational activity . . . physical examination findings were minimal as of 1/27/20" and "[t]he intensity of medication for pain remained similar to [Carney's] medication regimen while working. The slight increase in pain medicine dosing appears to be largely limited to evening use, which would not generally affect cognition at work." *Id.*

### vi. Unum's final denial

On June 15, 2020, Unum issued its final denial of Carney's benefits claim. Record at PageID.962-972. The denial relied heavily on Dr. Norris' conclusions. The denial noted that Carney's treatment and medication dosing "stable and at modest doses," *Id.* at PageID.966-67, that exam findings were "minimal and inconsistent with" the level of pain Carney reported, *Id.* at PageID.965, and that the additional support letters submitted by Carney's doctors did not change these conclusions. *Id.* at PageID.968-69. Unum's denial concluded that Carney was capable of

16

working, and that his record did not support a finding of "ongoing impairment after January 27, 2020." *Id.* at PageID.969.

## II.   Standard of Review

"Ordinarily, a plan administrator's denial-of-benefits decision is reviewed de novo." *Clemons v. Norton Healthcare Inc. Ret. Plan,* 890 F.3d 254, 264 (6th Cir. 2018) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Arbitrary-and-capricious review may be triggered if a plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[.]" *Id.* However, as of June 1, 2007, any such "discretionary clauses" are of no effect in Michigan. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 602-3 (6th Cir. 2009). Therefore, even if such a clause appeared in the plan here, the ordinary de novo standard of review applies. Unum does not dispute that de novo review is appropriate, instead arguing that its decision should be affirmed under either standard. ECF No. 12, PageID.1072.

Under that standard, no deference or presumption of correctness is afforded to the administrator's decision, and the Court instead endeavors to determine whether the administrator made the "correct decision" based only on the record before the administrator. *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990). The plaintiff bears the burden of proving, by a preponderance of evidence, that he or she is disabled. *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686,

700-01 (6th Cir. 2014). The Court must give a "fresh look" at the record, giving "proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings." *Id.* at 700.

"Where a district court determines that the plan administrator erroneously denied benefits, a district court may either award benefits to the claimant or remand to the plan administrator." *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009) (internal marks and citation omitted). The Sixth Circuit has explained that remand to the administrator, instead of an award of benefits by the court, is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Id.* at 373 (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir.2006))(citation cleaned up). Remand is also appropriate where the plan administrator merely "fail[ed] ... to explain adequately the grounds of [its] decision." *Majestic Star*, 581 F.3d at 373 (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir.2002)). In contrast, when "a plan administrator . . . arrives at the wrong conclusion that is simply contrary to the facts," a court should award benefits without remanding the matter and giving the plan administrator "a second bite at the apple." *Majestic Star*, 581 F.3d at 373-74 (internal citations and quotations omitted); *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 407 (6th Cir. 2015) (award of benefits without

18

remand is appropriate where the record establishes the claimant is "clearly entitled to benefits").

## III.   Analysis

In this case the Court must decide whether Dr. James Carney has proved, by a preponderance of evidence, that he meets the requirements of disability outlined in the long term disability plan issued by Unum. That plan requires Carney to be "limited from performing the material and substantial duties of his regular occupation due to sickness or injury," have a 20% or more loss in monthly earnings as a result of that sickness or illness, and to be under the regular care of a physician. There is no dispute that Carney is under the regular care of a physician. Similarly, Carney has lost 100% of his regular earnings, as he is no longer practicing medicine. The only issue to be decided is whether Carney's claimed disability prevents him from working as a physician.

### a. Carney has established that he is unable to work as a physician due to disability

As a preliminary matter, the Court notes that the relevant inquiry is less focused on Carney's ability to carry out the physical requirements of his work as a physician, and more on the cognitive component of his duties. Dr. Mindell did identify a number of physical restrictions and limitations that no doubt would have made the practice of medicine more difficult for Carney—among other things, Carney was restricted from lifting his arms above parallel to the ground and from prolonged sitting. But,

as Carney effectively concedes, he is likely able to fulfill the physical requirements of his job. *See* Record at PageID.603 ("my role as a physician does not involve lifting weights, nor really any physical tasks that your occupational and vocational specialist listed. *It's all cognitive*.") (emphasis added).

It would seem to belabor the obvious to point out that, in order to practice medicine effectively, ethically, and safely, a physician must be mentally fit and free of cognitive impairments.[10] A physician who is unable to exercise sound medical judgment represents, at best, an ineffective clinician and, at worst, a potential danger to his or her patients. Difficulty concentrating, suffering from excessive fatigue, or experiencing debilitating side effects from medication may render a physician unfit to practice medicine. *See, e.g., Chamness v. Liberty Life Assurance Co. of Bos.*, 234 F. Supp. 3d 885, 894 (W.D. Mich. 2017)(claimant was disabled and pre-

---

[10] *See* Code of Medical Ethics Opinion 9.3.1, American Medical Association (last visited, Mar. 28, 2022), https://www.ama-assn.org/delivering-care/ethics/physician-health-wellness [https://perma.cc/2RCT-VSJ7] ("When physician health or wellness is compromised, so may the safety and effectiveness of the medical care provided. To preserve the quality of their performance, physicians have a responsibility to maintain their health and wellness, broadly construed as preventing or treating acute or chronic diseases, including mental illness, disabilities, and occupational stress. To fulfill this responsibility individually, physicians should . . . [t]ake appropriate action when their health or wellness is compromised, including [e]ngaging in honest assessment of their ability to continue practicing safely.").

vented from working as a physician where claimant's treating doctor indicated claimant was limited from "practice of medicine [due] to impaired concentration and fatigue" as a result of depression and anxiety).

With that requirement in mind, the Court is satisfied that the objective medical evidence in the administrative record clearly demonstrates that Carney is "limited from performing the material and substantial duties" of a physician as a result of debilitating and chronic neck and back pain, the sleeplessness that pain causes, and the medication required to treat it. With regard to weighing Carney's self-reported level of pain, here the Court gives it considerable weight, as the Sixth Circuit has found to be appropriate where the claimant's "subjective level of pain is well-documented"—that is, where a claimant "has been consistent in reporting that his pain is debilitating and increasing." *Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894, 904 (6th Cir. 2020).

Further, Carney's pain, and the various methods attempted to treat it, has been documented objectively. Four different doctors who treated Carney—Dr. Mindell, Dr. Emmer, Dr. Laffer, and Dr. Jacobson—all agreed that Carney's pain, and the medications required to manage it, prevented him from practicing medicine. As in *Bruton*, Carney's doctors relied on a number of objective factors—such as the results of an MRI, nerve conduction study, diagnostic injections, and the results of other physical examinations—in reaching their unanimous conclusions that Carney was disabled. And also as was found in *Bruton*, while it is true

21

that Unum's reviewers determined that the evidence in Carney's file was inconsistent with his reported amount of pain, "there is no basis upon which to elevate the opinions of [Unum]-affiliated practitioners who did not observe or physically assess [Carney] over those of his treating practitioners" who did do so. *Id*. Finally, Carney has "underg[one] a host of pain-treatment procedures," such as "epidurals, [a needle electrode exam, a cervical rhizotomy and multiple test injections] . . . multiple consultations with specialists, physical therapy, and heavy doses of strong drugs." *Bruton*, 798 F. App'x at 904.

As the Sixth Circuit has explained, when a claimant undergoes difficult treatments for their claimed pain, as Carney has, it is "highly improbable" that they have done so "merely in order to strengthen the credibility of [their] complaints of pain and so increase [their] chances of obtaining disability benefits." *Id*. For the above reasons, the available medical evidence in the record supports the finding, by a preponderance of evidence, that Carney is disabled and clearly entitled to benefits.

**b. Unum's conclusion to the contrary is not persuasive**

For several reasons, the Court does not accept the contrary conclusions of Dr. Norris and the other Unum file reviewers as persuasive. First, the medical opinions upon which Unum relied were all based solely on reviews of Carney's file, rather than on in-person medical examinations, despite the fact that Carney's complaints (pain and its ensuing ef-

22

fects) are highly subjective in nature and amenable to more effective evaluation and understanding when personal communication and observation is possible. *See Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014)("Reliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints."). Second, Doctors Kim, Ju, and Broomes did not seriously consider or discuss Carney's claimed cognitive impairment. Third, every doctor who directly examined Carney concluded that he was unable to work as a physician due either to his pain, or the effects of the medication required to manage it. Dr. Norris' contrary conclusions are not persuasive, and at least some of Dr. Norris' conclusions are not borne out by the objective evidence present in the administrative record.

### i. Relative weight of treating doctors versus file reviewers

The parties vigorously dispute whether it was proper for Unum to deny Carney's claim based only on physicians' opinions who conducted "file reviews—" that is, without any independent medical examination of Carney conducted by Unum.[11] The parties also dispute whether this Court can, or should, assign more weight to the opinions of the various

---

[11] The plan at issue provides that Unum may require an independent medical examination: "We may require you to be examined by a physician, other medical practitioner and/or vocational exert of our choice." Record at PageID.113.

doctors who actually treated Carney and less weight to the opinions of those who only reviewed his medical records. In the ordinary benefits case, there is nothing "inherently objectionable about a file review by a qualified physician[.]" *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006). However, the Sixth Circuit has "repeatedly cautioned that plan administrators should not make 'credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination.'" *Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 302 (6th Cir. 2018) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).

Unum insists that neither Unum nor any of its reviewers made a determination of Carney's credibility. That argument is unpersuasive. The Sixth Circuit has explained that complaints of chronic, disabling pain are precisely those for which a physical examination is of great importance. *See, e.g., Guest-Marcotte*, 730 F. App'x at 301 (noting the importance of physical examinations "in particular, when an employee contends that she is disabled by chronic pain" and collecting cases); *Bruton*, 798 F. App'x at 901-904 (plan administrator made a credibility determination when it concluded that claimant's pain was "in excess of what would be expected" based on findings of physical exams).

Unum points to *Black v. Metro. Life Ins. Co.*, 244 F. Supp. 3d 625, 636 (W.D. Mich. 2017), in which a district court declined to give more

weight to the claimant's physicians' opinions regarding her ability to perform sedentary work with restrictions than it gave to the file reviewers, as "analogous to the present case." ECF No. 16, PageID.1107. But that case is distinguishable. The *Black* court declined to weigh the opinions of the claimant's treating doctors more heavily for two reasons, neither of which are found here. First, evidence received after the claimant's benefits application showed that the claimant's condition had improved. *Black*, 244 F. Supp. 3d at 635-37. No such evidence exists here. Second and "more importantly," in that court's view, the file reviewer conducted an interview with, and relied on the findings of, the claimant's physical therapist, who "was probably the most knowledgeable of [the claimant's] providers about her functional abilities and limitations," and that physical therapist opined that the claimant *could* perform sedentary work with restrictions. *Id.* at 637. Here, unlike in that case, Unum's reviewers did not interview any of Carney's treating practitioners and, even if they had, every physician, specialist, and physical therapist who has examined or treated Carney has concluded that he is *unable* to work. For the above reasons, the Court accords greater weight to the medical conclusions of Doctors Emmer, Mindell, Laffer, and Jacobson, all of whom examined Carney in person and concluded he was unable to practice medicine—than to the opinions of Unum's medical reviewers, whose conclusions were based only on file reviews.

### ii. Unum's reviewers failed to consider Carney's claimed cognitive limitations

As explained above, because Unum's reviews were all conducted based only on Carney's medical file, they are entitled to less weight in determining whether or not Carney's complaints of pain are credible. But the opinions of Unum's file reviewers—with the exception of Dr. Norris—are also unpersuasive for another reason: the reports of Doctors Ju, Kim, and Broomes did not discuss in detail or give sufficient consideration to Carney's claimed cognitive limitations. Moreover, their failure to consider Carney's claimed cognitive impairment—despite the fact that Carney's treating doctors repeatedly identified cognitive impairment as a critical part of Carney's claim—casts some doubt on the thoroughness of Unum's review process as a whole. So too does the fact that Dr. Broomes, who was the final reviewer before Unum denied Carney's claim, appears to have relied on at least one factual error in his analysis. Dr. Broomes stated that Carney "reported no side effects from Methocarbamol," Record at PageID.470, when in fact Dr. Emmer's notes from a December 16, 2019 appointment indicate that Carney "could not tolerate the medication," and its use was discontinued at that very appointment. *See id.* at PageID.263. For these reasons, the options of Doctors Ju, Kim, and Broomes are entitled to limited weight in the Court's analysis and are not persuasive.

### iii. Dr Norris' report is unpersuasive

Unum's final denial rested heavily on the report of Dr. Norris. However, for several reasons, the Court does not give that report significant weight. First, for the reasons explained above, the Court sees no reason to credit Dr. Norris' conclusions about Carney's credibility—whether or not he was experiencing the pain he says he was experiencing—over the conclusions of the various doctors who actually examined Carney.

Second, some of Dr. Norris' conclusions about Carney's medication regimen, tolerance, and treatment plan are not wholly supported by the record. For example, Dr. Norris concluded that the "level and intensity" of treatment remained "generally stable" without evidence of significant acceleration or advancement. Record at PageID.820. But, as Dr. Norris acknowledged, pharmacy records show that Carney began filling his Tylenol #4 prescription twice as frequently in November, 2019, consistent with escalating use of pain medication. *Id.* at PageID.828, 620-21. While Dr. Emmer initially prescribed one pill per day to be taken in the evening, by May 8, 2020, Carney indicated that he was taking up to four pills per day, a fact also documented in his treating doctor's notes. *Id.* at PageID.605, 719.

Dr. Norris also concluded that opiate pain medications would not interfere with Carney's medical practice, because Carney's opiate use appeared confined to the evening hours. But, as Carney pointed out, he was obligated to respond to patient calls and inquiries outside of working

hours, and had provided Unum with specific examples supporting the concern that evening opiate use would interfere with those obligations. And moreover, a significant reason Carney stopped working was that his pain became too severe to manage during the day *without* the use of pain medication.

Further, as to why Carney's medical file did not show an increase in pain management treatments beyond medication, Dr. Norris did not address the fact that, by March of 2020, certain pain management options were not available due to the COVID-19 pandemic—a fact highlighted by both Carney and his doctors. *See, e.g.*, Record at PageID.719 ("patient will be reconnecting with pain management once [COVID-19] allows to discuss additional treatment options); PageID.605 ("Dr. Wittenberg and his clinic services are unavailable" in light of COVID-19 pandemic.).

Third, Dr. Norris appeared to discount, without explanation, the statement of Dr. Laffer—who treated Carney's sleep disorder—that Carney's pain was interfering with his ability to use a sleep apnea machine at night, leading to what Dr. Laffer described as "effects of being fatigued and not able to concentrate." Record at PageID.800. Dr. Laffer further concluded that medication could improve Carney's sleep apnea, but that "that would impact his ability to function as a physician." *Id*. Dr. Laffer's statements were supported by several pages of medical records. As to

Carney's sleep, Dr. Norris appears to have discounted these concerns because Carney's records did not show that he "required recent clinical re-evaluation by Sleep Med," nor does it appear that Carney tried a "diagnostic treatment trial of wearing [a] cockup splint at bedtime" suggested by Dr. Emmer in January. *Id.* at PageID.354, 821. However, Dr. Norris did not address the unequivocal conclusion of Dr. Laffer, a sleep specialist, made several months later, that Carney was fatigued and unable to concentrate, and that treating his sleep condition with stronger medication would compromise his ability to function as a physician, with no mention of a cockup splint. For these reasons, Dr. Norris' report does not disturb the unanimous conclusion of Carney's treating doctors that Carney was unable to practice medicine.

In summary, this case turns on competing evaluations—by Carney's doctors and Unum's file reviewers—of Carney's subjective complaints of pain and the impact of that pain on Carney's ability to practice medicine. *James v. Liberty Life Assur. Co. of Bos.*, 582 F. App'x 581, 589 (6th Cir. 2014) ("Complaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient."). Carney's pain is a critical element of his claim. None of Unum's reviewers disagreed with the conclusions of Carney's treating doctors that Carney's MRI showed abnormalities in his spine—such as herniated discs. Rather, they disputed whether those findings could really be responsible for the level of debilitating pain that Carney reported. The conclusions of Unum's file

reviewers, for the reasons explained above, are insufficient to overcome the opinions of the doctors who examined, treated, and diagnosed Carney. *See, e.g., Pierzynski v. Liberty Life Assur. Co. of Bos.*, No. 10-14369, 2012 WL 3248238, at *7 (E.D. Mich. Aug. 8, 2012) ("Plaintiff's doctors have provided verifiable medical diagnoses which are uncontroverted by [the Plan Administrator]. While the level of pain caused by Plaintiff's diagnoses is disputed, the Court finds [the Plan Administrator's] arguments as to the degree of pain, and the reasonable accommodations that could be made, unpersuasive.").

## IV.   Conclusion

After conducting a de novo review, the Court finds that Carney is disabled according to the terms of the plan. Every doctor who treated Carney concluded he was disabled, and the contrary analysis conducted by Unum's reviewers is not persuasive.

For the foregoing reasons, Plaintiff's Motion for Judgment on the Record is **GRANTED**. Defendant's Motion for Judgment on the Record is **DENIED**. Unum is therefore directed to pay Plaintiff the benefits required under the terms of the plan. Plaintiff is entitled to receive back payments for long-term disability benefits beginning on March 1, 2020, which would have been the end of Plaintiff's 90-day elimination period, *See* Record, PageID.962, and continuing through the "maximum period of payment" set out in the plan, *See id.* at PageID.119, so long as Plaintiff continues to meet the requirements of the plan to receive such benefits.

**IT IS FURTHER ORDERED** that if Plaintiff intends to request an award of attorney fees, such request, along with documentation in support, must be filed within 21 days of the day this Order issues, and that Defendant may respond within 14 days thereafter**.**

As all of the outstanding claims in this matter have been fully resolved, this case is hereby **DISMISSED** with prejudice. The Court will retain jurisdiction to consider any request for reasonable attorney's fees.

**IT IS SO ORDERED.**

Dated: March 31, 2022       s/Terrence G. Berg
　　　　　　　　　　　　　　 TERRENCE G. BERG
　　　　　　　　　　　　　　 UNITED STATES DISTRICT JUDGE